## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **M.J. b/n/f MICHAEL JAEGER, SR. and** | § | |
| **STACIE JAEGER, INDIVIDUALLY** | § | |
| **a/n/f OF M.J., A MINOR** | § | |
| **Plaintiffs** | § | |
| | § | **Civil Action No. 5:10-cv-978** |
| **VICTOR CONTRERAS, PRESIDENT OF** | § | |
| **THE SCHOOL BOARD OF THE** | § | |
| **MARION INDEPENDENT SCHOOL** | § | |
| **DISTRICT, IN HIS OFFICIAL CAPACITY,** | § | |
| **JAMES HARTMAN, SUPERINTENDENT** | § | |
| **OF THE MARION INDEPENDENT** | § | |
| **SCHOOL DISTRICT, IN HIS OFFICIAL** | § | |
| **CAPACITY, AND THE MARION** | § | |
| **INDEPENDENT SCHOOL DISTRICT** | § | |
| **Defendants** | § | |

## FIRST ORIGINAL COMPLAINT

**NOW COMES** Michael Jaeger, Sr. and Stacie Jaeger, individually and as next friend of

M.J.[1] ("the student") collectively termed Petitioners herein, by and through their attorneys, Martin J.

Cirkiel from the law firm of Cirkiel & Associates, P.C., and Mike Zimmerman from the Zimmerman

Law Firm, brings this their *First Original Complaint* alleging that Victor Contreras, President of the

School Board of the Marion Independent School District, in his official capacity (hereinafter

collectively referred to as "the School Board"), James Hartman, Superintendent of the Marion

Independent School District, and the Marion Independent School District (hereinafter referred to as

the "Marion ISD"), hereafter referred to collectively as the "School District Defendants" violated the

various rights of M.J., as more specifically pled herein. Plaintiffs reserve the right to replead if new

---

[1] Initials are used to protect the confidentiality of the minor student and others similarly situated.

claims and issues arise upon further development of the facts, and as permitted by law. In support thereof Plaintiffs would respectfully show the following:

## I. INTRODUCTION AND BRIEF REVIEW OF THE CASE

1.  M.J. is a student with an emotional disability. He has been diagnosed with Bipolar Disorder and experiences very observable mood swings with emotional highs and extreme lows. The "high" phases were often characterized by poor judgment and aggressive behaviors, while the "low" phases involved depression, suicidal thoughts, anxiety, and fatigue. In the past, M.J. was also often inattentive in class, had impulsive behaviors, and had difficulty organizing tasks and activities. He was socially immature, socially inappropriate, and a social outcast. He made loud noises in class, has a tic, drummed on desktops, wore a helmet due to benging his head against things, would hit himself on the back of the neck, spoke aloud about his hallucinations and about seeing his dead cousin, had childish handwriting and once wrote all over himself during a test. All these behaviors were easily observable by students and teachers alike. He was made an outcast at school. He didn't have any friends, didn't have birthday parties or sleepovers, and wasn't a member of any clubs. He was laughed at when he asked questions. He was forced to eat lunch by himself and was put in an isolated classroom.

2.  He was verbally and physically bullied on almost a daily basis over the course of many, many years, making his young life one of torment. He was called "stupid" and "retard" due to the fact he had an irregular speech pattern. He was called "stoner" due to the fact he was taking psychoactive medications which effected his interactions with other students. He was verbally harassed daily, being called "motherfucker," "dumbass," "piece of shit," "asshole," "son of a bitch," "stupid," "stooge," "idiot," "dummy," and a "worthless piece of crap." In fact,

he was such an object of scorn that he was also told he was "worthy of suicide." Not surprisingly, he began to believe it.

3.      But it was not only verbal harassment. It did not stop there. There was more. Much more. He was a victim of physical bullying as well. He was a victim of daily pestering and frequent physical assaults. On a daily basis, he was tripped and bumped into in the hallways. On countless other occasions, the physical abuse was even more severe; a female student kicked him in the face while on the school bus; another threw insects on him; another whipped him with towels during physical education class; a group accosted him in the bathroom, causing him to became scared to use the bathroom during the school day; another put pen marks on a new shirt; another stabbed him with a pencil; others took his food in the cafeteria; another beat him so badly on the school bus he required medical care, so his parents started to drive him to school just to keep him safe; and another student would hit M.J. on the head with his ring almost daily, forcing him to leave the classroom just to get away. Due to the threats and taunts of students in his math lab class, he would arrive ten or fifteen minutes late to class to avoid his bullies. Due to the physical pestering, verbal threats, and taunts in the hallways, he would avoid going to his locker and come to his classes without books.

4.      Of course, these are only the incidents that that were reported to the school. There were numerous others that went unreported because M.J. was ridiculed into silence by school officials, who continually claimed that he was just making things up.

5.      The School Board did develop a few written policies regarding the identification of bullying and harassment based upon disability. They also eventually developed some policies and procedures about how school district personnel should respond to a complaint. As the staff

did not get the correct training and supervision, it is no surprise that the school district personnel failed to implement the policies and practices required when receiving a complaint. School district personnel told M.J.'s parents that their son's complaints were really just his imagination; that M.J. had a perceptual problem based upon his mental illness and emotional disturbances. Of course, as we now know, it was the school's failure to believe M.J. that exacerbated his emotional disturbance.

6.      In any case, and as no one believed M.J. when he said he was being bullied, it should likewise come as no surprise that the bullying worsened. M.J. became more and more depressed and even more suicidal. On one occasion, he threatened to leave the school campus and requested that the school administration contact the police. Upon the police chief's arrival, M.J. asked for his gun so that he could kill himself.

7.      It did not end there. During a special conference in February of 2009, M.J. told a group of his teachers that he was being bullied by a specific student. Again, his concerns were discounted; blamed on his own perception. They said he was mentally ill and misinterpreting the actions of the other students that others regarded as playfulness. Again, the school district personnel failed to follow their own policies in regard to investigating M.J.'s specific complaints.

8.      A few weeks later, the inevitable occurred – this student beat M.J. up so badly he had a fractured nose, requiring surgery to remove bone chips, and a blood clot.

9.      With no other choice, his parents made the decision to remove him from the toxic environment of the Marion Independent School District and into a private school. Since that time, he has thrived.

10.     Because of the acts and omissions of the Marion Independent School Board and School

District Defendants, and the discrimination based upon disability that injured M.J., by and through his natural parents, this lawsuit is brought pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794a ("Rehabilitation Act").

11.    In addition and in the alternative, and for these and other failures and violations of M.J.'s constitutional rights relative to the Fourteenth Amendment to the United States Constitution; Plaintiffs bring this action pursuant to 42 U.S.C. §§1983.

12.    Further and last, because M.J. still lives in Marion ISD and may return to the school district, he seeks injunctive relief, requesting this Court to issue an order that the Marion ISD follow the requirements of their own current school board policies regarding bullying based upon disability and the standard set forth by the U.S. Department of Education in their letter dated October 26, 2010.

## II. JURISDICTION

13.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the laws and rules of the United States as noted above.

14.    Finally, this Court has jurisdiction pursuant to Section 504 of the Rehabilitation Act of 1973 and 42 U.S.C §2000d et seq., to award attorneys fees and costs to the Plaintiffs

## III. VENUE

15.    Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiff's claims occurred in the Western District of Texas and in the San Antonio Division.

## IV. CONDITIONS PRECEDENT AND ADMINISTRATIVE EXHAUSTION

16.    Plaintiffs have exhausted their claims pursuant to the *Individuals With Disabilities Education*

*Act,* ("IDEA"), 20 U.S.C. §1415(1) and 19 T.A.C. §89.1185(p).

17.    In addition, Plaintiffs filed for and received an administrative hearing with an Impartial

Section 504 Hearing Officer, the Honorable Mr. James Hollis, Ph.D, J.D. On or about

December 8, 2009, a summary proceeding was held before the Hearing Officer. Shortly

thereafter, he issued a ruling in favor of the school district and against Plaintiffs in a number

of manners and particulars. Specifically, he found that while M.J. was in fact a victim of

bullying, he decided that there was not sufficient evidence to determine that it was because

M.J. had a disability, and that the district sufficiently investigated and acted upon his

complaints.[2] Plaintiffs appeal this decision.[3]

18.    In any case, Plaintiffs state that all conditions precedent to the filing of this lawsuit have been

fulfilled.

## V. PARTIES

19.    M.J. is a citizen of the State of Texas, and was, at all pertinent times, a pupil in the Marion

Independent School District. It is uncontroverted that he is considered a "student with a

disability," as defined by IDEA and Section 504 of the Rehabilitation Act of 1973. He lives

with his parents at 4400 Wosnig Road, Marion, Texas 78124.

20.    In addition, Michael Jaeger, Sr. and Stacie Jaeger are citizens of the State of Texas and

---

[2] **Error! Main Document Only.**In regard to Section 504 Administrative proceedings the Hearing Officer is
selected and paid by the school district, as is the formal record.  During the hearing there is no formal discovery, no
depositions or no cross-examination of witnesses.  The only school district documents the Hearing Officer reviews
are those given to him by the Defendants.  The only testimony he hears is that permitted by Counsel for the school
district.  Based upon this limited evidence it is no surprise Hollis found in favor of the school district. When Plaintiff
asked the Hearing Officer to reconsider his opinion, the school district told him he had no authority to do so and
refused to pay him to do so.
[3] **Error! Main Document Only.**Of course, now that M.J. has also brought forth claims based upon Section
1983 liability, the issue as to whether or not he was bullied solely because of a disability is solely determinative on
the viability of his cause of action.

residents of Guadalupe County and bring forward this complaint individually, and as M.J.'s parents, guardians, and next friends.

21.    Defendant VICTOR CONTRERAS is the President of the school board of the Marion Independent School District – a school board organized under the laws of the State of Texas and at all times responsible for the care, management and control of all public school business within its jurisdiction as to Petitioner M.J., the training of teachers at the School as to safety, and supervision of students within the district, and for the course of study. He may be served by and through Superintendent, James Hartman, Marion Independent School District, 214 W. Huebinger; Marion, Texas 78124. In addition, he may be served by and through his counsel of record, the Honorable Elvin W. Houston, Esq., of the law firm of Walsh, Anderson, Brown, Aldridge, Gallegos, P.C., One International Centre, 100 N.E. Loop 410, Suite 900, San Antonio, Texas, 78216.

22.    Defendant JAMES HARTMAN is the Superintendent of the Marion Independent School District – a school board organized under the laws of the State of Texas and at all times responsible for the care, management and control of all public school business within its jurisdiction as to Petitioner M.J., the training of teachers at the School as to safety, and supervision of students within the district, and for the course of study. He may be served personally at Marion Independent School District, 214 W. Huebinger; Marion, Texas 78124. In addition, he may be served by and through his counsel of record, the Honorable Elvin W. Houston, Esq., of the law firm of Walsh, Anderson, Brown, Aldridge, Gallegos, P.C., One International Centre, 100 N.E. Loop 410, Suite 900, San Antonio, Texas, 78216.

23.    Defendant MARION INDEPENDENT SCHOOL DISTRICT is a school district organized

under the laws of the State of Texas and at all times is required to follow the policies and procedures as set forth by the School Board. District personnel are thus responsible for the care, management and control of all public school business within its jurisdiction as to Petitioner M.J., the training of teachers at the School as to safety, supervision of students within the district, and for the course of study. They may be served by and through the Superintendent, James Hartman, Marion Independent School District, 214 W. Huebinger; Marion, Texas 78124. In addition, Plaintiffs reasonably believe they may be served by and through their counsel of record, the Honorable Elvin W. Houston, Esq., of the law firm of Walsh, Anderson, Brown, Aldridge, Gallegos, P.C., One International Centre, 100 N.E. Loop 410, Suite 900, San Antonio, Texas, 78216.

### VI. HISTORICAL, CULTURAL AND FACTUAL BACKGROUND

24.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

25.    The Marion Independent School District was on notice to the problem of bullying and harassment based upon disability.

**A.    THE HISTORY OF BULLYING AND HARASSMENT
IN THE UNITED STATES (1999-2000)**

**1.    1999**

26.    One of the darkest events crystallizing school related violence in the national consciousness was partially the result of school bullying: the shooting at Columbine High School in Colorado. Briefly, two male students embarked on a shooting spree killing 12 students, one teacher, injuring others and culminating with the two students/shooters taking their own lives. In the wake of the tragedy, many speculated that one of the motivating factors in this

massacre was the bullying that the two perpetrators were subjected to and witnessed. Observers noted that school administrators allowed an environment of bullying to persist creating intimidation and fear to develop which may have caused the two students to seek revenge on the school at large.[4]

27.    As a result, In 2001, the Colorado Legislature updated the powers and duties given to school boards with the Colorado Bullying Prevention Act. This law was a direct response to the Columbine incident. Specifically, it stated that school boards must have: "specific policy concerning bullying prevention and education."[5] Additionally, the law requires each school to submit, in the annual report to the state board of education, information concerning the school's policy on bullying prevention and education, including information related to the development and implementation of any bullying prevention programs.

**2.    2000**

28.    Similar to the 1999 Columbine massacre, Santana High School in California experienced a school shooting massacre. Student Charles Williams shot thirteen students, ultimately killing two. He was the subject of bullying at the hands of fellow students. The shooter's father reported that his son was subjected to taunting and bullying that bordered on torture.[6] The prosecution disputed this fact, but a study of the school's bullying problem conducted before the shooting showed about one-third of the schools students reported being the subject of abusive behavior on and off campus. This study demonstrated how pervasive bullying was in this school system. It should also be noted that the student's mental illness may have played a

---

[4] Adams, Lorraine and Dale Russakoff. "Dissecting Columbine's Cult of the Athlete." *Washington Post*. June 12, 1999
[5] Colo. Rev. Stat. Ann. § 22-32-109.1.

role in his violent outburst.

29.    In response, in October 2003, the state of California passed the Bullying Prevention for School Safety and Crime Reduction Act of 2003.[7] A major part of this legislation was the creation of a statewide group of educators to facilitate coordination between government agencies, school districts, youth- and community-based organizations and law enforcement to improve the school environment and take a broad based approach to bullying prevention. The legislation also requires the California Department of Education to develop model policies on the prevention of bullying, conflict resolution, and allow these policies to be adopted by school districts.

**3.    2001**

30.    In April of 2001, the New York State Legislature heard testimony from Bryan Corley, a 12 year old student from Windham, NY. He testified that for three years he was punched, kicked, choked, and subjected to verbal attacks because he had a ponytail, wore a rainbow necklace, and had two mothers.[8] This is one the first incidents of bullying being brought to the state legislature for consideration. At that time, the state took no action.

31.    Unfortunately, it took until June of 2010 for the state legislature to pass legislation in response to the bullying problem in New York. The Dignity for all Students Act was signed by Governor David Paterson, himself a victim of bullying due to his own disability as a blind student in New York City Public Schools. The law, among other things, seeks to ensure that all children attend school in an environment that is free from discrimination, harassment and

---

[6] http://legacy.signonsandiego.com/news/metro/santana/20010906-9999_1n6andy.html
[7] 2001 Cal. Stats., A.B. 79, Chap. 646
[8] http://www.nydailynews.com/archives/news/2001/04/28/2001-04-28_pols_told_of_school_bullying.html

bullying. It does so by directing schools to develop procedures to address bullying and discrimination, train personnel to respond to these incidents, creates model policies for school districts to follow, and the creation of a mechanism for the state to track bullying incidents.

**4.      2003**

32.    In yet another school shooting to receive national attention, Jason McLaughlin, a 15 year old student at Rocori High School in Cold Spring, Minnesota, shot and killed two fellow students. During his trial, one of the issues in dispute was McLaughlin's mental status and his insanity and how he reacted to bullying. Friends of the shooter spoke of harassment and teasing he suffered mainly revolving around his acne; one student reported: "He got a lot of stuff from people. You know, nobody would leave him alone. People would call him pizza face and stuff like that from his face."[9] One of the expert witnesses from McLaughlin's trial testified that the suspect believed he was doing the morally right thing because the victims represented the bullying he had suffered.

33.    Minnesota did not enact a bullying statute until 2007 after another school shooting where there were reports that the shooter was bullied. This legislation is detailed in the next response section.

**5.      2005**

34.    In the fifth deadliest school shooting in United States history, Jeffrey Weise killed his grandfather and grandfather's girlfriend, then drove to school and shot and killed seven other people, five students and two school district employees. He wounded five other students and

---

[9] http://news.minnesota.publicradio.org/features/2003/09/25_zdechlikm_reax/

eventually took his own life after a shootout with authorities. The shooter was reportedly bullied at school due to his weight, his dressing in all black, and his coming from a troubled family.[10] In the wake of this tragedy, it was discovered that the shooter led a rich internet life where he often wrote of his suffering at the hands of other students and wrote stories about hurting people at his school and a desire to take his own life.

35.     In reaching a settlement with the families of those killed or injured, twenty one families were each awarded one million dollar settlements, the largest allowed under state law.[11] In addition, two years later, Minnesota eventually passed a bare-bones statute addressing bullying in schools, which provided in total: "Each school board shall adopt a written policy prohibiting intimidation and bullying of any student. The policy shall address intimidation and bullying in all forms, including, but not limited to, electronic forms and forms involving Internet use."[12]

**6.     2006**

36.     In a case making national headlines a thirteen year old girl hanged herself after being cyberbullied over myspace. Megan Meier, a psychologically fragile young girl, was contacted by a fictional sixteen year old boy. The young boy, Josh, was actually created by Lori Drew, the mother of one of Megan's classmates, for the purpose of gaining information about Megan and using it to embarrass her. This was allegedly because Megan spread a rumor about that mother's child. After using the fictional boy to become friends with Megan and learn about her, the tone of the messages turned darker and eventually the boy told Megan

---

[10] http://query.nytimes.com/gst/fullpage.html?res=9B0CE7DF173FF937A15750C0A9639C8B63&sec=health&spon=&pagewanted=1
[11] http://www.startribune.com/local/30973484.html

that the world would be better off without her. Soon thereafter Megan took her own life. Eventually it became public knowledge that the boy, Joshua, was not an actual person, but instead made up by the parent of Megan's classmate in an effort to embarrass her.

37.    There were three main types of reaction to this incident. First, when the truth behind Josh's identity came out, these was a severe public outcry against the person who made the fake account, Lori Drew. Mrs. Drew lost her business and had to move away from the area. Second, the local prosecutors declined to press charges against Drew citing the lack of Missouri law to cover this type of behavior. Third, federal charges were brought against Drew for violation of the Computer Fraud and Abuse Act. Under a novel legal theory, the prosecution argued that when Drew and her co-conspirators violated Myspace's user agreement by creating a fake account, they were committing cyber fraud under federal law. While the jury convicted Drew on one count of the indictment, the Judge overturned the jury's verdict and found as a matter of law, Drew's violation of Myspace's user agreement was not the type of unauthorized use defined by the statute in question, Thus, she could not have violated the law as charged by the prosecutor. While this prosecution did not result in a conviction, it did bring national attention to the problems of cyber bullying.

38.    The Missouri legislature, in direct response to this incident, updated its harassment laws to include cyber bullying, text-messaging, and other electronic devices. This removed the requirement that the harassment be over the telephone or written, which was the bar the prosecutor cited in not filing state criminal charges. Similar federal legislation has been introduced but not passed.

---

[12] S.B. 646, 2007 Statutes §121A.0695;

**7.    2007**

39.    In what proved to be one of four suicides at one high school, Eric Mohat was continuously bullied until he took his own life at the age of seventeen. Mohat was noted to be a quiet and friendly student who was perceived as gay due to his interest in theatre and music. Most of the bullying took place in one math class and was observed by that teacher. Mohat's parents had previously alerted the school to the bullying their son suffered.

40.    Three weeks after the suicide of her friend Eric Mohat, Meredith Rezak took her own life. Shortly before committing suicide Meredith joined a school club, the Gay-Straight Alliance and told friends and family she thought she might be gay. Eventually she began to realize that she thought indeed she was a lesbian, and shared this with others. This created more bullying at school. In addition to the bullying, Meredith came from a volatile home life which was also a contributing factor to her suicide.

41.    This very same High School would experience two more student suicides that are thought to be suicide related by 2008. This one school having four student suicides in such a short period of time has recently garnered national media attention.

42.    From a legislative perspective, the state of Ohio passed comprehensive anti-bullying legislation in 2006. The legislation requires Ohio public school districts to adopt policies prohibiting bullying, harassment and intimidation. The law outlines a specific definition of these negative behaviors and requires that districts develop procedures for documenting, investigating and reporting complaints.

43.    The parents of students who suffered bullying and took their own lives found this legislation to be of little value. They point out that the legislation allocated no funding for anti-bullying

programs and does not have any enforcement mechanism. In light of this, some families have filed lawsuits against the school district. The family of Eric Mohat is not seeking financial compensation, only the recognition that their son's death is the result of bullying and that the school puts in place more effective anti-bullying programs.

**8.    2009**

44.    On April 6, 2009, Carl Joseph Walker-Hoover's mother discovered his body hanging from their Massachusetts home. All the bullying and taunting is thought to have begun months earlier when Walker-Hoover got into an argument with a female student after his knapsack knocked into a television which then bumped that female student. To make matters worse, Walker-Hoover was at a new school where he had few friends. After this, Walker-Hoover's classmates called him gay on a daily basis, made fun of his clothes and threatened to harm him. Walker-Hoover's mother contacted the school numerous times and made them aware of the bullying. On the day she discovered his body, she was scheduled to meet with the school again to discuss the way her son was being treated at school. Her son was only 11 years old.

45.    No criminal charges were filed and a legislative response in the state of Massachusetts is detailed in the next section.

**9.    2010**

46.    On January 14, 2010, Phoebe Prince committed suicide after being bullied at her Massachusetts school. Prince, who grew up in Ireland until the age of 14, moved with her mother and siblings to the United States in 2008. Shortly after beginning at a new school, Prince was taunted and bullied by two groups of girls over a brief relationship she had had with a senior boy on the football team. This bullying took place over a number of months. On

January 14, 2009, after three months of bullying at school, a student threw an energy drink can at Prince as she walked home from school. Later that day, Prince hanged herself in the stairwell of her apartment building, to be discovered by her younger sister. After her death, students from her school posted crude, offensive, and inappropriate comments on a facebook page memorializing Prince. Prince's aunt had perviously notified the school district about the abuse Prince had suffered.

47.   There were two main reactions to this incident, one legislative and the other criminal. On the legislative front, in March 2010, a state anti-bullying task force was set up as a result of her death. The Massachusetts legislation was signed into law on May 3, 2010. This legislation was comprehensive and mandates reporting of bullying incidents to school officials as well as addressing bullying in school and outside including the internet. It requires teachers and other school staff to report bullying to the principal or another administrator picked to handle reports when they see or become aware of it. It mandates training for teachers and staff, every year, on prevention and intervention. It calls for instruction on heading off bullying for students in every grade level as part of the curriculum. This legislation was a direct response to these two recent student suicides. Massachusetts House Speaker Robert A. DeLeo said in a statement on the signing, "In light of recent tragedies, the House has taken the appropriate steps to protect our students from the terror of bullying and cyber-bullying.''

48.   Perhaps what is most notable about the Prince incident, is that this is one of the first instances where the perpetrators of the bullying were charged criminally for their conduct. On March 29, 2010, the local District Attorney Elizabeth Scheibel announced that six students from South Hadley High School were indicted on felony charges by a grand jury.

Charges ranged from statutory rape for the two male teenagers involved (both adults under Massachusetts law) to violation of civil rights, criminal harassment, disturbance of a school assembly, and stalking. Additional delinquency complaints were also filed against the other female minors indicted by the grand jury. One was charged with assault with a deadly weapon for throwing a can at Phoebe Prince. The district attorney indicated that, contrary to officials from South Hadley High School, administrators were aware of the bullying and did not take appropriate actions to protect students. The trials for these students are scheduled to begin in December of 2010.

49.    Also in January, 2010, Montana Lance, a fourth grader in Lewisville ISD, hung himself in the school nurse's bathroom after incessant bullying.

50.    In March, 2010, Jon Carmichael, an eighth grader in Joshua ISD, after being bullied at school and even told that he should kill himself, did just that when he went home and hung himself in a nearby barn.

51.    In September, 2010, Asher Brown, an eighth grader in Cypress-Fairbanks ISD, shot and killed himself in his home after he had taken all of the bullying and harassment that he could handle.

**B.    THE FEDERAL GOVERNMENT AND BULLYING**

52.    Prior to the Columbine incident, in January of 1999, the U.S. Department of Education ("DOE") produced a document, *Protecting Students From Harassment And Hate Crime,* which essentially provided for schools a checklist of items, that if they followed, would help to develop a culture that make the schools safer for all students and help to prevent bullying and harassment. These items included, but were not limited to, the mandate that Board

members, administrators and the superintendent should:

a.      recognize the urgency of the problem and identify people/agencies that can help develop effective prevention and response strategies;

b.      compile a library of useful materials;

c.      work on creating an effective anti-harassment program in consultation with parents, students, and community groups;

d.      appoint a Compliance Coordinator to train School personnel;

e.      assess the school climate to determine the prevalence of harassment that exists and the potential for hate-motivated violence;

f.      adopt a written anti-harassment policy and assure the policy is clearly communicated to all members of the school community; and school personnel and students are held accountable for their actions;

g.      develop a formal grievance procedure and take steps to make sure it is working properly;

h.      have instructional personnel use or supplement a district's curriculum and pedagogical strategies to foster respect and appreciation for diversity;

i.      institute, improve, or expand age appropriate student activities to prevent or reduce prejudice and conflict;

j.      institute specific measures to respond immediately and effectively when harassment occurs to stop the harassment and prevent recurrence;

k.      flexibly apply response mechanisms to both the victim and the perpetrator, taking into account the parties' ages and the context of the behavior;

l.      continually monitor the school climate and promptly address problems that could lead to harassment or violence or that indicate that harassment could be occurring;

m.      appoint appropriate school officials to become familiar with pertinent civil and criminal laws at the state, local, and federal levels, so that they are able to recognize possible civil rights violations, hate crimes and other criminal acts;

n.      develop guidelines and procedures for collaboration with law enforcement officials, make appropriate referrals to outside agencies and designate liaison personnel;

o.      assure Crisis Intervention Plans are in place to minimize the possibility of violence or disruption of the educational process;

p.      have District-level personnel and individual school sites form continuing partnerships with parents and the community to prevent hate crimes and harassing behaviors;

q.      provide Staff training and professional development programs to support the district's anti-harassment efforts;

r.      assure that all harassment incidents are carefully documented and incidents are reported to outside authorities as required; and also

s.      regularly assesses the effectiveness of its anti-harassment efforts.

53.    Statistical studies showed that children with disabilities were most likely to be the victims of bullying and harassment. For this reason, the U.S. DOE next produced, and on behalf of both their own *Office Of Civil Rights* and the *Office Of Special Education And Rehabilitative Services* another document called the "Memorandum Regarding Harassment Based Upon Disability." In that writing the DOE noted that intimidating or abusive behavior towards a student with a disability, that creates a hostile educational environment for that student or

denies the student's ability to participate in certain benefits, services or opportunities at the school, to the same extent as non-disabled students, would be considered "disability discrimination," pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504"). Further, it was considered a denial of the student's right to a *Free Appropriate Public Education* ("FAPE") pursuant to that act.

54.     This document, developed now almost a decade ago, also provided a section called "*How To Prevent and Respond* (emphasis added) *To Disability Harassment.*" It generally paralleled the list of items noted in the *checklist* noted above, but strengthened language directing a school district to create "a campus environment (emphasis added) that is aware of disability concerns and sensitive to disability harassment." Again, among other things, school boards were directed to, be "weaving these issues (of bullying and harassment based upon disability) into the curriculum or programs outside the classroom." School Boards were now required to have not only policies, but active programs and ongoing practices in place to address discrimination on the basis of disability, including and especially bullying and harassment based upon disability. This writing also produced, and in effect, a checklist that requires Board members, administrators and the superintendent to:

   a.     widely publicize anti-harassment statements and procedures for handling discrimination complaints, because this information makes students and employees aware of what constitutes harassment, that such conduct is prohibited, that the institution will not tolerate such behavior, and that effective action, including disciplinary action, where appropriate, will be taken;

   b.     provide appropriate, up-to-date, and timely training for staff and students to

recognize and handle the potential for harassment;

c.      provide counseling for the person who was harmed by harassment and the person(s) who have been responsible for the harassment of others;

d.      implement monitoring programs to follow up on resolved issues of disability harassment; and

e.      regularly assess and, as appropriate, modify existing disability harassment policies and procedures for addressing the issue, to ensure effectiveness.

55.    As we know the problems with bullying and harassment continued, so the Department of Education later developed, and in concert with the Health Resources & Services Administration at the Health & Human Services Dept., a *Best Practices In Bullying Prevention and Intervention*." In addition, the U.S. Dept. Of Justice produced *Bullying In Schools*. All these resources were readily available for school board's so that these policies, programs and practices could be implemented into the student body climate.

56.    Over the course of the time the *Office Of Civil Rights* within the United States *Department Of Education* issued numerous opinions on the issues of bullying and harassment, and discrimination based upon disability, further giving school boards direction as to how to deal with this ongoing threat to not only the safety of children but to assure they were received an education that was not hostile. The OCR noted that a failure to do any of the following various items could create a hostile educational environment and be considered discrimination based upon disability:

a.      provide school assemblies and instruction on bullying;

b.      address bullying in classroom intervention settings;

    c.      conduct a school bullying assessment;

    d.      form a bullying prevention coordination team at school;

    e.      include language specifically identifying bullying in the school rules;

    f.      develop strategies to prevent bullying in hot spots;

    g.      post signs in classrooms prohibiting bullying & listing its consequences; and

    h.      encourage students to help classmates who are being bullied & to report bullying.

57.    In regard to handling incident once reported, the OCR noted that the failure to do any of the following, could rise to the level of discrimination based upon disability and incur liability upon a school district:

    a.      train staff on how to investigate a claim of bullying and harassment based upon disability;

    b.      fully investigate allegations of bullying and harassment;

    c.      respond to each allegation promptly;

    d.      interview the student and the perpetrator;

    e.      keep a written record of the investigation;

    f.      taken prompt action against the perpetrators;

    g.      remove the perpetrator from the class;

    h.      take action to prevent future incidents;

    i.      offer to transfer the student or to a different class;

    j.      offer counseling for the student victim;

    k.      offer counseling to the perpetrator;

    l.      notify the parents of the bullied child their procedural safeguards pursuant to Section

504 of the Rehabilitation Act of 1973;

m.    notify parents of their right to grievance procedures under Section 504;

n.    offer the student a 1:1 aide or "shadow" for protection;

o.    offer social skills training to the student;

p.    offer social skills training to the perpetrator;

q.    offer social skills training to the student's class;

r.    convene a meeting of the parents, and educators to discuss the issues of bullying and harassment;

s.    use a program to monitor and oversee the resolution of incidents;

t.    hire a temporary paraprofessional to monitor the perpetrator after the incident;

u.    perform a psychological evaluation of the student victim after the incident;; and

v.    most importantly, use the incident as a "teaching moment" for the perpetrator and even the entire student body.

58.    These guidelines were not only a mere federal mandate, but were integrated into, and became part of Texas law, as well through increased penalties in the Juvenile Justice system for students who bullied and harassed other students.

59.    On October 26, 2010, the United States Department of Education Office of Civil Rights put out a letter outlining a school district's responsibility to address bullying and harassment. This letter instructed schools to have "well-publicized policies prohibiting harassment and procedures for reporting and resolving complaints." This letter also instructed schools that they must take "immediate and appropriate action to investigate." Upon discovery of harassment, this letter instructed schools that they must "take prompt and effective steps

reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring."

## C.    THE STATE OF TEXAS AND BULLYING

60.    In addition, the Texas Education Agency ("TEA") and their various local service centers working under TEA's purview developed and disseminated a significant amount of support material for school board's as to how to best prevent bullying and harassment in general, and bullying and harassment based upon disability in particular. Importantly, school board's were provided information on how to best respond to bullying and harassment, when it occurred.

61.    In Texas, many of these mandates were developed into policies and procedures by the Texas Association of School Boards and provided to school boards across Texas. The Marion Independent School District definitely adopted some policies regarding bullying and harassment, and regarding discrimination based upon disability. They also generally provided some very general discussion of these issues in the student handbook. Many school boards across the country, and across our own great state, heard this clarion call and made anti-bullying campaigns an integral part of that school district's practices and customs. Unfortunately, many others, like the Marion Independent School District, only gave it "lip service."

62.    In 2005, the Texas Legislature passed House Bill 283.[13] The bill allows a victimized student to transfer to another classroom or school within the district.[14] School districts must provide a "discipline management program" that prevents and educates concerning bullying.[15] The

---

[13] http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess+79R&Bill+HB283
[14] Tex. Educ. Code § 25.0341
[15] Tex. Educ. Code § 37.083(a)

bill also requires school districts to establish standards for student conduct, which must prohibit bullying, harassment, and making "hit lists."[16]

63.    In 2009, State Representative Garnet Coleman filed the Dignity for All Students Act ("DASA"). The bill, as filed in 2009, would have prohibited discrimination and harassment in public schools on the basis of ethnicity, color, gender, gender identity or expression, sexual orientation, disability, religion or national origin. It would have also prohibited discrimination based on association with a person, and protects both the parents of students and whistleblowers who may report incidents of discrimination or harassment. In addition, school districts would have had to report each incident to the Texas Education Agency as well as provide periodic training to employees for the purpose of preventing bullying. However, the bill never made it out of the Public Education Committee. DASA has been continually filed since 1997, first by then-State Representative Harryette Ehrhardt and beginning in 2003 with Representative Coleman.[17] On October 1, 2010, State Representatives Coleman and Jessica Farrar announced their intention to once again file DASA when the 2011 Texas Legislature comes into session.[18]

64.    Also in 2009, Representative Mark Strama filed the Safe Schools for All Youth Act ("SSAYA"). The bill addressed cyber-bullying and bullying that occurs off-campus. The bill defined "bullying" as engaging in physical conduct or written or verbal expression, including expression through electronic means, on or off of school property, that will have the effect of physically harming a student, damaging a student 's property, or placing a student in

---

[16] Tex. Educ. Code § 37.001(a), (b)
[17] http://www.dallasvoice.com/houston-legislators-coleman-farrar-announce-intentions-reintroduce-dignity-student-act-1046663.html

reasonable fear of harm to the student 's person or of damage to the student 's property . . .is

sufficiently severe, persistent, or pervasive enough that the action or threat creates an

intimidating, threatening, or abusive educational environment for a student . . . or

substantially disrupts the orderly operation of a school. The SSAYA passed out of the Public

Education Committee and the Calendar Committee, but died in the House.[19]

65.     Other laws in the Education Code address the issue of bullying. For instance, a student must

be removed from the classroom if the continued presence threatens the safety of other

students or teachers.[20]  In addition, the district's board of trustees may place a student in

disciplinary alternative education if the board determines the student's presence threatens the

safety of other students or teachers.

## D.    MARION INDEPENDENT SCHOOL DISTRICT'S RESPONSES TO BULLYING AND HARASSMENT

66.     A review of the documents provided by the school district in the underlying Section 504

administrative hearing evidences that the Marion Independent School Board and School

District have done very little in regard to the general problem of bullying and harassment as

well as the particular problem of bullying and harassment based upon disability as to M.J..

67.     Thus it is not surprising that when M.J. and his parents made numerous complaints that M.J.

was a victim of bullying and harassment, the school district did not correctly respond, as

required by law and in most cases, by their own written policies.

68.     Specifically, there is no evidence in the record provided in the administrative hearing that in

regard to <u>prevention</u> of bullying and harassment in general, or in regard to children with

---

[18] Id.
[19] http://www.capitol.state.tx.us/tlodocs/81R/billtext/pdf/HBO1323H.pdf
[20] Tex. Educ. Code § 37.006 (d)(2)

disabilities, the School District Defendants actually put into practice many of the numerous and various items noted above.

69.    Nor is there any evidence in the administrative record that in regard to <u>dealing with a complaint</u> of bullying and harassment, like the ones made by M.J. or his parents, the School District Defendants had any actual practices in place to address such complaints.

70.    Nor was there any evidence that the Marion Independent School Board trained personnel as to these various practices.

71.    Nor was there any evidence that the Marion Independent School Board supervised personnel as to these various practices.

72.    In short, and rather then promote a school climate that was sensitive to the issue of bullying, harassment, and discrimination based upon disability, the School District Defendants actually fostered a climate where bullying and harassment was rampant and when it occurred, did not know how to respond.

73.    Though any one of the failures noted above, taken in isolation, may not necessarily evidence the school violated the rights of M.J. based upon his disability, the failures of the school district to develop programs and practices sensitive to bullying and harassment of students with disabilities absolutely affected the perception of school district officials and personnel in this case. When M.J. and his parents brought forward complaints that he was a victim of bullying and harassment they heard but did not listen.

74.    It is with all this in background that Petitioners now provide their specific "Statement of Facts" about M.J.

**E.**    **STATEMENT OF FACTS ABOUT M.J.**

75.    Marion ISD was on notice that M.J., a student with a disability, was a target of bullying and harassment based upon his disability.

76.    M.J. is now a 16-year-old boy, having been born on December 22, 1993. He is a citizen of the State of Texas and was, at all pertinent times, a pupil in the Marion Independent School District. He lives with his natural parents, mother, Stacie Jaeger, and father, Michael Jaeger, Sr., at 4400 Wosnig Road, Marion, Texas 78124.

77.    M.J. received a diagnosis of Bipolar Disorder (non-specified) and experiences mood swings from emotional highs to lows. The "high" phases are characterized by poor judgment and aggressive behavior; the "low" phases can involve depression, suicidal thoughts, anxiety, and fatigue. He also has a diagnosis of *Attention-Deficit Hyperactivity Disorder* ("ADHD"). As such, M.J. is often inattentive, has impulsive behaviors, and has difficulty organizing tasks and activities.

78.    Over the course of M.J.'s education he was a beneficiary and recipient of special education services at Marion ISD, with a diagnosis of Emotional Disturbance. M.J. is a student with a disability severe enough to limit major life activities as defined by federal law.

79.    In short, M.J.'s disabilities, made apparent by his erratic behavior, anxiety, panic attacks, paranoia, and hallucinations are easily observable by other children.

80.    He is socially immature, socially inappropriate, and had few friends at school.

81.    Since as early as 2005, M.J. as been the target of harassment and bullying at school.

82.    In fact, Mr. and Mrs. Jaeger recall discussing the issue of bullying and harassment very early on at several *Admission, Review and Discharge* ("ARD") Committee meetings from 2005-2009. These ARD Committee minutes lack notation of these discussions.

83.    Specifically, and during the sixth grade (2005-2006), while M.J. attended Marion Middle School, M.J. reported he spoke often with Mr. Jon Lindholm, who was the Vice-Principal at that time. M.J. would tell Mr. Lindholm that other kids were bullying him but the bullying would only worsen.

84.    To Plaintiffs' knowledge, this harassment was neither properly reported nor investigated by the school as defined in the 2005-2006 MISD handbook under "Harassment" and "Investigating Harassment."

85.    Also during this year M.J., was repeatedly bullied. T.S., a student, kicked him in the face while they were on the school bus.

86.    S.S., a student, bullied him throughout the year, mostly while in gym class. S.S. threw insects at M.J. and whipped him with towels. M.J. reported it to his gym teacher. The teacher's response was to yell at S.S. whenever he saw him bully M.J. Not surprisingly, the bullying continued, and worse, even more children began to harass M.J. A pattern soon developed. When M.J. complained, he was separated from the group. In this instance he was to sent away from the class and told to adjust the sprinklers on the baseball field.

87.    To the Plaintiffs' knowledge, this incident was neither properly reported by district personnel nor investigated by the school as defined in the 2005-2006 MISD handbook under "Harassment" and "Investigating Harassment."

88.    In an email written to Principal Villareal on or around November 8, 2006, Mrs. Jaeger notes that she received a complaint that four students were harassing M.J. and calling him names. The email mentions that Coach Langenberg, Coach Wiatrek and Ms. Breitzke were knowledgeable about the complaints. She notes that the allegation was considered just

another one of his perception problems; these things [harassment] happen to everyone and M.J. is just now getting the taste of it.

89.    To the Plaintiffs' knowledge, this allegation of bullying and harassment was neither properly reported by Coach Langenberg, Coach Wiatrek, or Ms. Breitzke nor investigated by Villareal, as defined in the 2006-2007 MISD handbook under "Harassment" and "Investigating Harassment."

90.    On or about January 26, 2007, Mrs. Jaeger wrote an email to Ms. Villareal, Coach Langenberg, and Ms. Lanford, explaining to them that there is a student who is taking every opportunity harass M.J. and was trying to bully him into fighting due to the fact that he has a "tic" like sound in his voice.

91.    To the Plaintiffs' knowledge, this harassment was neither properly reported to school administration by any of these staff persons nor investigated by the school as defined in the 2006-2007 MISD handbook under "Harassment" and "Investigating Harassment."

92.    At that same time, M.J.'s parents also let school district personnel that their son was seeing a physician for his problems. The notes from the annual *Admission, Review & Discharge* ("ARD") Committee meeting for M.J. reflect that the parents gave school district personnel consent to procure past, present, and future medical and psychological records of M.J.'s ongoing treatment in order to plan an appropriate *Individualized Education Plan* ("IEP") for M.J. The school never requested this relevant information about M.J.

93.    A review of the medical records provided by the parents are replete with discussion about M.J. being bullied at school. The earliest one is from January 27, 2005, as completed by Dr. Holder. But the school failed to procure this information and of course, failed to serve M.J. in

concert with his medical and mental health condition.

94.    With the bullying increasing and the no one listening, in the seventh grade (2006-2007), M.J. began to have even more noticeable problems in school. His self-esteem lowered as more and more negative experiences occurred at school. For instance, some of M.J.'s schoolmates bullied him when he used the bathroom. They would kick the stall panels and door, and try to take his things by reaching under the stall. Because of their past experiences with the school, his parents felt desperate enough that M.J.'s only solution was to avoid using the bathroom at school.

95.    During the same school year, M.J. also tried to avoid his locker, as he was subjected to bullying and harassment in the hallway near his locker. As a result, M.J. often showed up at class without his books.

96.    M.J. reported these problems to his mother and father. They again brought these issues to the ARD Committee held during M.J.'s seventh grade year. Rather than attempt to keep M.J. safe so that he could function in the regular education environment, as non-disabled children, the district suggested he use a nurse's bathroom instead. The committee did make one good suggestion: that he keep a journal.

97.    Mr. Jaeger states that during the ARD Committee meeting, the staff again focused on M.J.'s supposed "perception problems." Like any "big lie," finally his parents too began to question whether M.J. was the source of the problems and that there actually was no bullying going on at school. For M.J., not only did school personnel not believe him and think he was "crazy," now his parents wondered as well.

98.    On or around April 23, 2007, M.J. was found in the hallway banging his head against the

wall.

99. On or around May 3, 2007 M.J. wrote a note in which he detailed a bus incident with S.S. that almost escalated into a fight. He wrote that the other students would not leave him alone and that he just wants to get away from them. He went on to write how he went to the office to report what had happened. Shortly thereafter, he was put into a mental hospital for three days.

100. To the Petitioner's knowledge this incident was not properly investigated by the school as defined in the 2006-2007 MISD handbook under "Harassment" and "Investigating Harassment."

101. In eighth grade (2007-2008) M.J. remembers that the bullying continued. One student put long pen marks on a new shirt. M.J. remembers specifically complaining to one of his teachers but again no action was taken nor were policies and procedures followed.

102. He remembers numerous times that he was tripped by other students while walking to the cafeteria. M.J. remembers frequently landing on the floor to be seen by students and teachers alike.

103. That year, M.J. experienced difficulty in school on account of his medications for his disabilities. M.J. had difficulty adjusting to the medication and consequently experienced physical and mental instability.

104. Ms. Lanford reported to Ms. Villareal about M.J.'s behavior on or about September 17, 2007. She stated M.J. had reported to her that he was being bothered by another student. Ms. Lanford reports the student was questioned and such behavior was denied. She and Ms. Lopez spoke with M.J. about his reports. Ms. Lanford reported that Michael began hitting

himself when Ms. Lopez talked with him about reporting someone on an allegation that was previously addressed.

105.    To the Plaintiffs' knowledge, this harassment was not properly investigated by Ms. Lopez as defined in the 2007-2008 MISD handbook under "Harassment" and "Investigating Harassment."

106.    During the fall semester of 2007 M.J. frequently went to the office to discuss ongoing problems with Ms. Lopez. She did not investigate any of his claims he was bring bullied by others.

107.    Rather, on or about October 2, 2007 Ms. Lopez shared her frustration about M.J. with Ms. Villareal, stating that he was sucking the life out of her.

108.    On that same day, M.J. reported to Ms. Villareal that Ms. Lopez had told him that he was just looking for attention. Ms. Villareal reported that M.J. screamed out that he does not want their attention.

109.    On or about October 18, 2007, M.J. told a teacher that a student "flipped him off" all the time in the hallway.

110.    On or around October 25, 2007, Mrs. Jaeger sent an email to Ms. Villareal and Mr. Hartman, stating that she felt that her son was not getting a positive school experience.

111.    During this period, M.J. remembers that he was on medications and other students called him "stupid," "retard," and "stoner."

112.    He also remembers that several students would tell him he was "worthy of suicide."

113.    On November 14, 2007, there was an email from counselor Zelda Langford stating that he put a gun to his head. She failed to provide any intervention.

114. On one occasion in December 2007, he threatened to leave the school campus and requested that the school administration contact the police. Upon the police chief's arrival, M.J. asked for his gun so that he could kill himself.

115. This incident did result in an Admission, Review, Dismissal ("ARD") meeting. It was held on or around December 5, 2007, where school personnel and M.J.'s mother agreed to a self-contained placement at school to meet M.J.'s emotional needs.

116. This resolution proved ineffective as M.J.'s behavioral progress and academic achievement suffered for the remainder of the school year.

117. On or around January 7, 2008, M.J. scribbled all over himself during a test.

118. On January 13, 2008, M.J. was admitted to Laurel Ridge Hospital.

119. On or around January 14, 2008, Ms. Lopez sent an email to Ms. Blackman, Ms. Villareal, Ms. Langenberg, and Ms. Lanford stating that they needed to have a staffing for M.J. because the staff wrote that "for now we are NOT meeting ANY of his educational needs."

120. In the minutes of a meeting on or around January 23, 2008, staff decided that when M.J. claimed he was being bullied, he was really attempting to manipulate them and it was a sign of his mental health problems. The team noted that M.J. went to the nurse on occasion complaining of nose bleeds after being punched and having his head banged but staff made no intervention.

121. On or about February 15, 2008, M.J. wrote in his journal, that was seen by his teacher, than he was assaulted in the bathroom.

122. On or about February 18, 2008, M.J. detailed in his journal serious and specific threats made by students against him and his family.

123.  He requested these threats be shared with the Marion Police Department.

124.  On or about February 18, 2008, M.J. wrote that he felt very unsafe at school because of threats by other students and how Marion ISD staff does nothing to stop it. He stated that he cannot quit thinking about the threats.

125.  M.J. wrote specifically that he told a teacher that two students made him feel unsafe at school because of threats they had been making to him and his family and were always doing mean things to him.

126.  M.J. requested that someone at Marion ISD speak with Mr. Trigg, a substitute teacher at MISD, about threats he heard made against M.J. on or around February 15, 2008.

127.  M.J. requested that the following persons read his journal entries: Ms. Villareal, Mr. Felts (the Region XIII observer), Mrs. Jaeger, and Ms. Blackman (the head of MISD Special Education at this time).

128.  M.J. detailed an assault on him by A.B. that occurred on or around February 15, 2008 in one of the middle school bathrooms. M.J. writes that the student hit him in the arm several times and tried to hit him in the kidneys but he was able to block most of the punches to save face but that he did not hit back.

129.  In the time period after M.J. reported A.B.'s attack to school administration, A.B. engaged in repeated verbal assaults of M.J., using expletives and calling him "stupid." The attack and the verbal assaults created an even more hostile environment for M.J.; he became afraid to use the bathroom at school because of the risk of another dangerous encounter with A.B.

130.  Ms. Lopez stated that she requested that Mr. Trigg, a substitute teacher, investigate this incident. He did not conduct an investigation as required by district policy. He did not make a

written report as required by district policy.

131.    On or about February 18, 2008, M.J. wrote a detailed list of derogatory slurs he was being called by certain students. The list includes "motherfucker," "dumb ass," "piece of shit," "asshole," "son of a bitch," "stupid," "stooge," "idiot," "dummy," "worthless," "piece of crap," and "fucker." He also reports being *flicked off* every single day and how these students get away with it every day. The teacher failed to investigate any of these concerns.

132.    On or about February 18, 2008, Ms. Villareal wrote that she received the journal pages M.J. wrote and asked him to discuss it with his parents at home.

133.    To the Plaintiffs' knowledge, the ongoing threats and attack against M.J. that occurred on or around February 15, 2008 was not shared with Marion Police Department nor was it properly investigated by the school as defined in the 2007-2008 MISD handbook under "Harassment" and "Investigating Harassment."

134.    The district's 2007-2008 MISD handbook includes nothing specific about bullying or investigating allegations of bullying.

135.    The 2008-2009 MISD handbook does include specific sections about bullying and investigating allegations of bullying.

136.    M.J.'s handwritten reports of harassment are covered in all three areas of 'Prohibited Harassment' as defined by MISD policy yet no proper investigation was conducted.

137.    At the end of his eighth grade year and during his ninth grade year (2008-2009), M.J. experienced numerous threats and physical altercations with his peers at school. Because district personnel did not believe him, he did not report all of the incidents to school administration staff or even his parents, but he did report some of them.

138.  On or around March 3, 2008, M.J. reported to his teacher that students in his English class were picking on him. This was recorded in a teacher's log.

139.  On or around April 4, 2008, Mrs. Jaeger complained in an email to Ms. Villareal and Ms. Lopez about the perception by school district personnel that M.J. was not being bullied and that it was his imagination.

140.  On or around October 6, 2008, M.J. reported that students in his English class were picking on him. This incident was also recorded in a teacher's log and in a note written by M.J..

141.  On or around October 27, 2008, A.B. physically attacked M.J. during school by grabbing M.J. by the neck and choking him.

142.  After going to the hallway, M.J. took it upon himself to go to "ABLE." Once there, he informed the ABLE teachers of the incident who then took him to the school's office to report the attack. This was recorded in a teacher's log.

143.  The school failed to address the impact of the attack on M.J. The school also failed to implement appropriate safety measures to prevent future bullying and otherwise provide a safe environment for M.J. at school as set forth in the 2008-2009 MISD handbook.

144.  During his ninth grade year, in the fall of 2009, M.J. was repeatedly harassed and bullied by A.B. during his math lab class. On almost a daily basis, A.B. would walk by M.J.'s desk and hit M.J. on the head with his ring. Due to A.B.'s harassment and the taunts of several other students, M.J. was afraid to attend his math lab class. He would even arrive ten or fifteen minutes late to class so that he could avoid his bullies. The math lab's teacher, Ms. Donna Paschal, failed to protect M.J. from the hostile environment that existed in her classroom.

145.  School administration continued it's discriminatory policy of separating M.J. from these

students by removing M.J. from the unsafe and hostile environment instead of ensuring the school environment was safe for him.

146.    Moreover school administration continued to place the blame on M.J., the victim, by maintaining it was his mistaken perception that students were harassing and bullying him. This discrimination based on M.J.'s disability stands in direct contrast to the district's policy as set forth in the 2008-2009 MISD handbook.

147.    The day after the attack, on or around October 28, 2008, M.J. reported that students in his math lab were making "choking" noises at him and he became upset. This was recorded in a teacher's log.

148.    In October 2008 during M.J.'s ninth grade year (2008-2009) M.J. was stabbed with a pencil by a student (M.W.). M.J. reported this incident to a teacher who wrote it in their log but he did not then identify the other student.

149.    At the beginning his ninth grade year, M.J. was eating lunch at school when another student, J.T.S., approached him and grabbed his food. M.J. shouted at the student to give back his food, at which point a teacher intervened. The teacher, Coach O'Bryan, inquired about the altercation, which M.J. explained. The teacher then told M.J. to go back to his seat and that M.J. would be punished later.

150.    Following this incident, the school did not contact M.J.'s parents. In fact, M.J. alone informed his mother of the situation. The school did not make the parents aware of any resolution of the incident nor did the school implement appropriate measures to prevent future bullying and provide a safe environment for M.J.

151.    Mrs. Jaeger told Ms. Woodward that M.J. will not be punished because he was the victim of

bullying and harassment.

152.    In October of 2008, M.J. had another altercation with the same student, J.T.S. During a bus ride home, J.T.S. punched M.J. in the side of his abdomen. By the time M.J. arrived home he had developed stomach cramps and was frequently urinating. M.J.'s parents took him to a local clinic for medical attention and testing. Although the doctor's tests showed no permanent physical injury, M.J.'s mother decided it was wisest to have M.J. stop using the school bus for transportation.

153.    This decision came at severe hardship for the family due to the mother's recovery from neck surgery at the same time. After this incident, the school's only response was to arrange for an apology by M.J.'s attacker.

154.    To the Petitioner's knowledge this assault was not properly investigated by the school as defined in the 2008-2009 MISD.

155.    The school failed to address the impact of the attack on M.J. and failed to implement appropriate measures to prevent future bullying and provide a safe environment for M.J. as set forth in the 2008-2009 MISD handbook.

156.    Mrs. Jaeger called the bus barn to speak with Donna White and complain about the problems M.J. was having on the bus. She left a message on White's voicemail. Ms. White never returned the call.

157.    She also called Ms. Lopez, the High School Principal. She left a message for her as well. Ms. Lopez never returned the call.

158.    When M.J.'s classmates harassed him, he asked Ms. Paschal if he could go to "ABLE", the area at school designated by his Individualized Education Program (IEP) for him to cool-off.

Ms. Paschal refused. M.J. responded by affirming that his IEP permitted him to access ABLE at any time during the school day. Ms. Paschal again refused and told him to sit down.

159. Mrs. Jaeger approached Ms. Villareal and requested M.J. be removed from Math lab because he was not getting his work done due to him being tormented by certain students on almost a daily basis. The school dismissed this request because the staff said he had avoidance behaviors and just did not like math, but the district also placed Ms. Woodward in the math lab as an occasional observer.

160. On February 26, 2009, an ARD meeting was held for M.J. Although his mother was notified of the meeting, the school official denied her request that the meeting be rescheduled on account of her presently being sick with the flu. This was the first ARD meeting M.J.'s mother did not attend. There is nothing in the ARD invitation that indicates the school invited Mr. or Mrs. Jaeger to attend by phone.

161. M.J. attended the meeting and told the ARD committee that he was a victim of ongoing bullying and specifically about A.B.'s harassment. The minutes for the meeting show no meaningful discussion of this issue occurred among the committee and no decisions were made to provide a safe environment for M.J.

162. Less than two weeks later on or around March 10, 2009, A.B. made comments about fighting M.J. and tried to lure him. into a bathroom. Shortly afterwards, M.J. was outside when A.B. battered M.J. multiple times with his fists. M.J.'s response was to cover up while A.B. punched him repeatedly. The police arrived on the scene after the attack had ceased.

163. On the morning of March 9, 2009, Mr.Wiatrek wrote in a report that M.J. seemed very upset in between third and fourth period. He noted that M.J. was having problems with another

student at the vending machines but this claim was also not investigated.

164.    This incident was the most serious of M.J.'s attacks at school. After the altercation, M.J.'s mother took him to Northeast Methodist Hospital's emergency room. Hospital staff treated M.J. for a bloody nose and performed a CT Scan. The scan showed that M.J.'s sinus was fractured. The following week, M.J. underwent surgery to remove bone fragments and a blood clot from his sinus.

165.    M.J.'s physical condition also included dental injuries. The inside of M.J.'s mouth was scraped badly due to braces on his teeth and required orthodontic attention to repair damage done to his braces.

166.    In addition to the physical injuries he has suffered, M.J. suffered from mental anguish and anxiety from the attack and he refused to go into public places in his hometown.

167.    On March 13, 2009, M.J.'s mother spoke with the Ms. Lopez on the telephone. His mother asked the principal what the school would do to protect M.J. when he returned to school. Ms. Lopez defensively replied that the school would base its decision on the recommendation of the prosecutor.

168.    This statement by Ms. Lopez stands in contrast to Marion ISD policy set forth in the 2008-2009 handbook in which the school shall promptly take interim action calculated to prevent prohibited conduct during the course of investigation. This is to be done regardless of whether a criminal or regulatory investigation regarding the same or similar allegations is pending.

169.    On or around March 24, 2009, the school finally began their own investigation. Ms. Lopez was forwarded an email that stated Mr. Kalkwarf had been approached several times by M.J.

about A.B. bothering him but that this teacher failed to have this complaint investigated.

170.  Also, Ms. Lopez received an email from Robyn O'Bryan that detailed the previous fall's cafeteria incident where J.T.S. had ruined M.J.'s lunch. O'Bryan too failed to have this complaint investigated.

171.  Overall, the abuse that M.J. experienced caused him to anxious, depressed, angry, and even suicidal. M.J. dreaded the thought of going to school and distanced himself from his classmates by avoiding extracurricular school activities.

172.  M.J. even gave up his longtime participation in the Boy Scouts of America due to the bullying and harassment he garnered at school from being a Scout. The state of affairs at school has made M.J. and his parents miserable even at home.

173.  When M.J. did report incidents of bullying and harassment, he was told by school teachers and by administrators to ignore it, that he was perceiving the situation incorrectly, or that he was just trying to gain attention.

174.  Not only did the school's responses fail to address the problem, they were counterproductive. When the school did choose to respond to M.J.'s bullies, it resulted in the bullies becoming more incensed at M.J. because of he had exposed their misdeeds.

175.  Nevertheless, M.J. continued to attend school in a hostile environment that the school fostered. The abuses he experienced ranged from subtle insults like name calling and children making pen marks on his new shirt and backpack to more serious bullying like being pushed onto the floor and having his books kicked across the hallway by an older student.

176.  M.J. states he does not recall going to any kind of assembly or class about bullying nor does he recall ever receiving any handouts or seeing any flyers that covered the subject.

177.    To the knowledge of Mr. and Mrs. Jaeger, the district never offered M.J. a transfer, professional counseling, or a one-on-one aide.

178.    To the knowledge of Mr. and Mrs. Jaeger, the district never provided M.J. services related to bullying or harassment.

179.    To the knowledge of Mr. and Mrs. Jaeger, the district has not provided any type of system to anonymously report bullying.

180.    To the knowledge of Mr. and Mrs. Jaeger, none of M.J.'s teachers or MISD staff were trained to address bullying and harassment.

181.    To the knowledge of Mr. and Mrs. Jaeger, Marion ISD presented one lecture on bullying for parents called *Connections* when M.J. was in the sixth grade. No further programs were offered for the next three years M.J. was a student at MISD.

182.    After repeated experience in this same cycle, M.J. reasoned that it was safer for him to not even involve the school; reporting the harassment and bullying only made things worse for him because the school did not protect him effectively.

183.    Following the results of the school's investigation, M.J.'s parents realized that the school was not willing to provide their son a safe educational environment and therefore enrolled him in a private school for the 2009-2010 school year, planning to keep him there through his graduation.

184.    M.J. stated that he is very happy at his new school because it has been "extremely welcoming" and he is currently friends with "practically the whole school".

## VI. CLAIMS FOR RELIEF PURSUANT TO THE REHABILITATION ACT OF 1973

185.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and

effect as if herein set forth.

186.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 and its implementing

regulations require that each state that receives disbursements, including the state's political

subdivisions such as local school districts, must ensure all students with disabilities are given

appropriate and necessary accommodations, pursuant to federal law and rules. To the degree

that a policy or practice hinders honest consideration of a disabled child's unique needs, and

fails to accommodate that child's disability and keep the student safe, it violates Section 504.

187.    Plaintiffs assert that because the Defendant school district has failed to keep M.J. safe from

harm, and failed to provide him an environment that was not hostile, such failures as noted

above, have, together and separately, contributed to violating his rights under Section 504,

federal rules and regulations promulgated pursuant thereto.

188.    In addition and in the alternative, the failure of the school district to develop an

*Individualized Educational Plan,* commensurate with his unique and individualized needs,

rises to the level of a gross mismanagement of his educational plan and is also a violation of

Section 504 thereby.

## IX. STATE ACTION

189.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and

effect as if herein set forth.

190.    The Defendant school district was at all times and in all matters acting under color of state

law when they permitted Plaintiff to be subjected to the wrongs and injuries set forth herein.

## XI. CLAIMS PURSUANT TO 42 U.S.C. §1983 AND THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION

191.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and

effect as if herein set forth.

192.    In addition and in the alternative to Plaintiffs' Section 504 claims, he contends the School District Defendant, acting under color of law and acting pursuant to customs and policies of the district, deprived M.J. of rights and privileges secured to him by the Fourteenth Amendment to the United States Constitution and by other laws of the United States.

193.    The acts and omissions of the school district deprived M.J. of his rights to life, liberty and bodily integrity guaranteed under the United States Constitution, for which the School District Defendant is liable to M.J. pursuant to 42 U.S.C. §1983 for compensatory monetary damages.

## XII.  UNCONSTITUTIONAL POLICIES, PROCEDURES , PRACTICES & CUSTOMS

194.    Plaintiffs incorporate by reference all the above related paragraphs above with the same force and effect as if herein set forth.

195.    Plaintiffs contend that these failures of the School District Defendant to have policies, procedures and practices to protect M.J. from a known and inherent dangerous situation, violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.

196.    Plaintiffs contend that these failures of the School District Defendant to have policies, procedures, practices and customs in place to assure staff was correctly trained, so as to protect M.J. from a known and inherent dangerous situation, violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

197.    Plaintiffs contend that these failures of the School District Defendant to have policies,

procedures, practices and customs in place to assure staff was correctly supervised, so as to protect M.J. from a known and inherent dangerous situation, violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.

198.    Based upon the operative facts, such acts and omissions rise to the level of deliberate indifference, constituting a violation of the Fourteenth Amendment of the Constitution of the United States, and for which C.A. seeks recovery pursuant to 42 U.S.C. §1983.

## XIV. <u>RATIFICATION</u>

199.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

200.    The School District Defendants ratified the acts, omissions and customs of school district personnel and staff.

201.    As a result the School District Defendants are responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of M.J.

## XV. <u>PROXIMATE CAUSE</u>

202.    Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

203.    Each and every, all and singular of the foregoing acts and omissions, on the part of Defendants, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XVI. <u>LIMITATIONS</u>

204.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and

effect as if herein set forth.

205.    Plaintiffs reasonably believe the Respondent school district may argue that all or part of M.J.s' claims are barred by the one (1)-year statue of limitations as set forth at 19 Tex. Admin. Code §89.1151( c). However, Plaintiffs believe the one (1)-year statute of limitations is not applicable to this cause as M.J. may benefit from the tolling theories contemplated by Section 504 of the Rehabilitation Act of 1973, the ADA and Section 1983.

## XVII. <u>DAMAGES</u>

206.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

207.    As a direct and proximate result of the Defendants' conduct, M.J. has suffered injuries and damages, for which he is entitled to recover herein within the jurisdictional limits of this court, including but not limited to:

a.    Physical pain in the past;

b.    Medical expenses in the past;

c.    Mental anguish in the past;

d.    Mental anguish in the future;

e.    Mental health expenses in the past;

f.    Mental health expenses in the future;

g.    Physical impairment in the past, and

h.    Various out-of-pocket expenses incurred by the parents of M.J. but for the acts and omissions of the Defendants.

## XIX. <u>ATTORNEY FEES</u>

208.    Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth herein

209.    It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon

        judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to under 42

        U.S.C. §1988(b), 42 U.S.C. §794a, 42 U.S.C. §12131, pursuant to 42 U.S.C. § 2000d et seq.

## XX. <u>DEMAND FOR JURY TRIAL</u>

210.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues

        in this matter.

### PRAYER

211.    **WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against each

        Defendant and request an order including but not limited to the following relief:

    a.    A judgment in favor of M.J., as supported by a finding that the Defendant school

          district did not correctly accommodate M.J.'s disability and keep him safe from harm,

          during the periods claimed, in total or in part;

    b.    A judgment in favor of M.J., as supported by a finding that the Defendant school

          district violated Section 504 of the Rehabilitation Act of 1973, during the periods

          claimed, in total or in part;

    c.    A judgment in favor of M.J, as supported by a finding that the Defendant school

          district violated M.J's rights pursuant to the Fourteenth Amendment to the United

          States Constitution, during the periods claimed, in total or in part;

    d.    A judgment in favor of M.J. in an amount sufficient to fully compensate them for the

          elements of damage enumerated above;

    e.    An order directing the Defendant school district to take any and all other specific

actions required by any and all the statutes noted above;

f.    An order declaring Plaintiff as prevailing party so that Defendants, jointly and severally, would be required to pay or reimburse Plaintiffs for all costs of preparation and trial of this cause of action, including, but not limited to, filing fees, costs of representation, advocate fees, attorney fees, and expert witness fees, incurred by them up to and through trial, and for its appeal if required, pursuant to Section 504 of the Rehabilitation Act of 1973; the ADA, 42 U.S.C. §1983 and §1988; together with pre- and post-judgment interest, and court costs expended herein; and

g.    Such other relief as the Court may deem just and proper in law or in equity.


                              Respectfully submitted,

                              Cirkiel & Associates, P.C.


                               /s/ Martin J. Cirkiel 
                              Mr. Martin J. Cirkiel, Esq.
                              1901 E. Palm Valley Boulevard
                              Round Rock, Texas 78664
                              (512) 244-6658 [Telephone]
                              (512) 244-6014 [Facsimile]
                              marty@cirkielaw.com [Email]
                              State Bar No. 00783829

                              Mr. Michael Zimmerman, Esq.
                              The Zimmerman Law Firm
                              301 W. Waco Drive
                              Waco, Texas 76710
                              (254) 752-9688 [Telephone]
                              (254) 752-9680 [Facsimile]
                              mzimmerman@thezimmermanlawfirm.com [Email]
                              State Bar No. 222714007

                              **ATTORNEYS FOR PLAINTIFFS**